REBECCA HUFFMAN et al., Appellants, v. WILLIAM T. HUFFMAN.

In Banc, March 9, 1909.

1. FIDUCIARY RELATION: Undue Influence: Setting Aside Deed to Son. It is not every case in which an aged, sick and infirm father who is under the ministering care and in the house of the son that raises such a presumption of undue influence as would justify the setting aside of a deed in the son's favor. And in this case, if the fiduciary relation so existed as to cast the burden on the son to prove no undue influence, he has met and discharged it by showing that the deed was executed under circumstances free from suspicion, and by showing by several witnesses, reputable and intelligent, that the father, several years before he made the deed, said that the land belonged to the son, and that it was purchased and the title taken in his name with the proceeds of the son's interest in an Illinois farm.

2. SETTING ASIDE DEED: Incapacity: Deference to Chancellor. The grantor was seventy-four years old, and for three years had been in bad health. According to his widow's testimony he had asthma, rheumatism, heart trouble, kidney disease and other infirmities, and suffered intense pain, and for two weeks spoke only when spoken to, and then answered

only yes or no. The title to 240 acres of contiguous land was in his name, and six days before he died he deeded 120 acres of it to his son, who had previously resided on it and improved it. Nineteen months before his death he moved with his aged wife from his home into the house of the son and was cared for by him until his death. His widow and other children sue to set aside the deed. She testified that "his mind was very unbalanced, his condition was bad, he could not remember anything scarcely at all, he never said anything, he never talked any that day." His physician testified that three days later and three days before his death "his condition was very bad, he would only talk when I talked to him, and then he gave very short answers; he seemed to understand what I said to him and I understood what he said; he was in no shape for a general line of business, he was sufficiently rational to appreciate what I said and to give me a rational answer, but to judge of the degree and strength and liability I could not draw a line there hardly." The attorney, who drew the deed, testified that the widow said in the grantor's presence, and in the absence of the son, that her "husband isn't able to make a deed," and thereupon he asked him numerous questions which brought forth the information that the grantor knew who the attorney was, knew what he came to his house for, that it was to make a deed to the son, that he wanted that deed made, that he said he remembered a conversation he had had with the attorney nearly four years previously in which he had said the son owned the land, and that he recalled that at that time he stated he expected to make the son a deed, and that it was his wish that the deed be now made. *Held*, that, the evidence being conflicting, deference will be made to the chancellor who had the witnesses before him, and his finding that he was not incapacitated to make the deed will be upheld.

*Held*, by WOODSON, J., in a dissenting opinion, that the evidence shows that the physical condition of the aged grantor was such that he could not lie down, but for two weeks had sat propped up in a chair, with his head in his hands and his elbows resting on his knees or the arm of another chair, suffering from intense pain; that he was blind and deaf; that he could not feed himself or administer to his commonest necessities, but those kindly offices had to be performed by his wife, as if he were a baby; that his hands and feet were drawn and twisted out of shape by rheumatism; that uraemic poisons from the rheumatism and kidney troubles had spread through his body and they, together with malnutrition, had caused the blood vessels to thicken and an enlargement of the eye-lids which closed them; that there was no circulation of the blood in the lower two-thirds of the lower limbs, and they were cold and

blue, and one of them had an offensive running sore; that he answered only in monosyllables, and all he said during the two weeks indicated no more intelligence than that of a suffering ordinary child; that these facts were established by his wife and his physician and were not in the slightest contradicted by any one; and, they established his incapacity beyond question to make a valid deed, and that the deed signed only by his touching the pen, and against the protest of his wife at the time that he was not capable of making a deed, should be set aside.

Appeal from Monroe Circuit Court.—*Hon. D. H. Eby,* Judge.

AFFIRMED.

*James P. Boyd* for appellants.

The court should have set aside and declared null and void the deed in controversy, under all the evidence. Where one stands in relations of trust and confidence with another who is old and failing in mind, the law will presume a contract between them to have been the result of undue influence emanating from the stronger party. And where a deed is made under such circumstances, and the terms are extraordinary or unreasonable, or the consideration nugatory or insufficient, or where the consideration is set forth contrary to the truth, the same in a court of equity will be set aside. If, in such case, an advantage is gained by the grantee, undue influence on his part is presumed, and must be rebutted or the deed must fall. Dingman v. Romine, 141 Mo. 466; Garvin v. Williams, 44 Mo. 465; Cadwallader v. West, 48 Mo. 483; Ryan v. Ryan, 174 Mo. 279; Mowry and Kettering v. Norman, 204 Mo. 191; Roberts v. Bartlett, 190 Mo. 702; Dausman v. Rankin, 189 Mo. 707; Martin v. Baker, 155 Mo. 495; Campbell v. Carlisle, 162 Mo. 644; Hegney v. Head, 126 Mo. 628. The evidence clearly establishes that defendant stood in what is termed a confidential or fiduciary relation to Jacob F. Huffman, the grantor in the deed in controversy. The terms confidential relations

or fiduciary relations are used by the courts and text-writers as convertible terms. Robin v. Hope, 57 Cal. 497; 13 Am. and Eng. Ency. Law (2 Ed.), 11. The examination, prior to the execution of the deed, with reference to the capacity of the father to execute a valid and binding contract, shows that defendant and his attorney considered there was an occasion for it; that they deemed it prudent to arrange in advance for evidence to fortify the deed. As to his examination, the answers received clearly show that the father had not the capacity to transact important business like this, that his mind was not of sufficient strength to cope with that of his adversaries, defendant and his attorney. A man may be capable of making a will and yet be incapable of making a contract or managing his estate. Maddox v. Maddox, 114 Mo. 35; Brinkman v. Rueggesick, 71 Mo. 556; Jackson v. Harding, 83 Mo. 175; Crossan v. Crossan, 172 Mo. 702.

*J. H. Whitecotton* and *T. T. Rodes* for respondent.

(1) While gifts or voluntary conveyances from parent to child may be shown to have resulted from undue influence practiced by the child, there is no presumption of such from the relation merely, and it has been even further held that this fact will not cause the transaction to be looked upon with suspicion even. 29 Am. and Eng. Ency. Law (2 Ed.), 132; McKinney v. Hensley, 74 Mo. 318; Doherty v. Noble, 138 Mo. 24; Bonsall v. Randall, 192 Mo. 525. The mere fact of the proof of the execution of a deed by a parent to a child does not raise any presumption of undue influence. The issue of undue influence under the pleadings and the evidence was submitted to the trial court and the presumption on appeal is that the court entertained correct views of the law and where there is substantial evidence to support the judgment it will be affirmed. Kellerman v. Railroad, 60 Mo. App. 255; Sebree v.

Patterson, 92 Mo. 451.   (2)   The testimony is overwhelming that respondent owned an undivided half interest in this tract of land.   The evidence shows or tends to show a fixed and often-repeated purpose and that the act was his free and voluntary act and deed. The issue of incapacity was submitted to the court on the testimony pro and con, and the finding of the court on this issue was against appellants, and under the authorities of this State this court will not disturb that finding.

## IN BANC.

PER CURIAM.—The following opinion delivered by VALLIANT, P. J., in Division No. 1, is adopted as the opinion of the Court in Banc.   All concur except WOODSON, J., who files a dissenting opinion.

## IN DIVISION ONE.

VALLIANT, P. J.—Rebecca Huffman, who has died since this appeal has been pending, and whose executor has been made a party herein, was the widow, and the other parties, plaintiffs and the defendant, are the children' and heirs at law of Jacob F. Huffman, deceased, who died intestate February 29, 1904.   Six days before his death, he executed a deed conveying to his son William T., the defendant, 120 acres of land; the aim of this suit is to set aside that deed on the alleged grounds that the intestate was not of sufficient mental capacity to make it and that defendant exerted undue influence over him.   The trial resulted in a finding and judgment for the defendant and the plaintiffs appealed.

The evidence for the plaintiffs established the fact that the intestate, then an old man of seventy-four years, and his wife Rebecca sixty-nine, in September, 1903, moved from his farm on which he had before been living to the home of defendant, which was another

farm, and lived there, in his son's home, until he died, that is, from some day not specified in September, 1903, to February 29, 1904. Both these farms belonged to him, that is, the title to both was in him. For two or three years he had been in very bad health; according to the widow's testimony, he had asthma, rheumatism, heart trouble, kidney trouble and other bodily infirmities; he required great care and tender treatment and these he received at her hands. Questioned as to his mental condition on the day the deed was executed she said, "It was very unbalanced, his mind was, his condition in every way." Again she said: "His mental condition was bad; . . . he could not remember anything scarcely at all, he never said anything, he never talked any that day; if I asked him anything he would not answer, all he wanted was a little milk." Dr. McMurry, the physician who attended him, saw him on the 26th of February, which was three days after the execution of the deed and three days before his death, a witness for plaintiffs, described his physical condition as very bad, much as Mrs. Huffman had described it. He was then asked to say "as to his mental condition as to whether or not in your opinion he was able to make contracts and transact ordinary business? A. He would only talk when I talked to him, and then give me very short answers; he seemed to understand what I said to him and I understood what he said; his answers were simply, 'Yes' or, 'No,' or, 'Feeling very bad,' is about the extent of what he said. Q. You have not answered my question, I asked you whether or not in your opinion as a physician he was mentally able to make contracts and carry on ordinary business? A. Well, he was in no shape for a general line of business. He was sufficiently rational to appreciate what I said and give me a rational answer, but to judge of the degree and strength and liability, I could not draw a line there hardly." That is the substance

of the plaintiff's testimony on the point of mental incapacity.

On the subject of undue influence the plaintiff's testimony tended to show that after the old man moved to defendant's home the latter attended to the renting of his farm for him and attended to negotiating some real estate loans for him; that on the day before the deed was executed defendant went to Paris, the county seat, and employed an attorney who was also a notary public to come out to the farm and write the deed and take the acknowledgment; he insisted that the lawyer come the next afternoon, and the lawyer went as he agreed to do, arriving rather late in the afternoon, because of obstructions in the road caused by rain-flooded creeks; that when the lawyer arrived defendant met him at the fence and conducted him into the house and to the door of the room where the old man and Mrs. Huffman were and announced to them that Mr. Rodes (the attorney) had arrived; that Mrs. Huffman had not been informed that the attorney was expected or what his business was. Her account of the meeting and what occurred is substantially as follows: Mr. Rodes stated that he had been requested by William (the defendant) to come out there; and he requested to have William called into the room, which was done; when William came Rodes said he was ready for information as to the lines of the 120 acres and he and William went out on the porch and there William showed him how the lines were, then they came back into the room; the paper that Rodes had prepared became blurred with water and he had to write another; after it was written he read it to William and asked him if it was right and William said it was. Rodes said, "Mrs. Huffman you must sign it," but she said she would not, because they had not given her any of the improvements and she would not sign it until Ed. Huffman was provided for; then there was some wrangling, in which she told them that her husband was not competent to make a

deed, she said: "Well, we fussed a while and I looked at my husband, he looked so poor and bad, and he was sitting there not hearing or seeing anything at all, I just thought not to have any trouble I will sign it." She also said the deed was not read to her or her husband; she did not see the deed in her husband's hands at all and did not think he delivered it to William. Plaintiff's testimony also tended to show that this 120 acres was the only land the old man owned that was not encumbered and that it was worth $500 to $1,000 more than the other 120 acres.

On the part of the defendant the testimony was to the following effect: Neighbors and acquaintances testified that they called on the old man and he recognized them and talked with them rationally, he complained of his physical infirmities and said he was suffering, but they testified that they saw no impairment of his mental faculties. The family had come to Missouri from Illinois, and this 240-acre farm, 120 acres of which were covered by this deed, was purchased with the proceeds of the sale of their farm in Illinois, in which the defendant had an interest. The old man had at several times in past years been heard to say that half the farm belonged to William and he refused to put this 120-acre tract into a mortgage he was giving for money he was then borrowing because he said it rightfully belonged to William, and when on one such occasion it was suggested to him by the bank cashier in the course of the transaction that if it belonged to William he ought to give William a deed to it he said it was unnecessary because all the family understood it. The 120 acres in question were not more valuable than the remaining 120, except it contained more improvements, which were not very valuable.

The testimony of Mr. Rodes was that he was employed by William to go out to the farm and write the deed and take the acknowledgments and that William paid him for the work after it was done. As to

what occurred after he arrived at the farm he said in substance that when he entered the room he was cold and he first warmed himself by the stove, then turned to Mr. Huffman and said it is growing late and we had better get about that business, "I asked him what land is it you want to deed to William, he says, I want you to deed all of this land that is unincumbered to William." Witness then prepared the deed filling in the names and when he got down to stating the consideration he asked, "Mr. Huffman what consideration do you want put in this deed, he said, $40—just what the land cost," referring to the cost price years ago. William was not in the room at that time, only Mr. and Mrs. Huffman and the attorney. Mrs. Huffman made objection to signing the deed because she said there was some mistake in the lines that gave William the house, then she called William into the room, he pointed out the lines (it does not appear from the evidence from what document the pointing out was done, but presumably from a map), then William went out of the room again and then Mrs. Huffman said some provision should be made for Eddie because of some improvement Eddie had put on the Illinois farm; Rodes said he knew nothing about that, then Mrs. Huffman called William into the room again and requested that he remain there; then she and William discussed her proposal to make provision for Eddie, William contended that the alleged improvement made by Eddie was of no value, the old man interrupted the discussion saying, "Eddie has forfeited any right he had there by leaving and going to California." The discussion led to no agreement; at its close the attorney asked Mrs. Huffman if she was then willing to sign the deed, she said, "Mr. Rodes, it isn't legal, my husband isn't able to make a deed." Mr. Rodes then turned to Mr. Huffman and said: "Q. Do you know who I am? A. Yes, Friend Rodes. Q. Do you know what I came out here for? A. Yes. Q. What was it? A. To make a

deed to William. Q. Do you want that deed made?
A. I do. Q. Do you remember a conversation you
had with me in my office in the fall of 1900, in which
you told me that William T. Huffman owned a half
interest in this prairie farm? A. I do. Q. Do you
recall that you stated that you expected to make him a
deed? A. I do. Q. Is it your wish that the deed now
be made? A. It is." Mr. Rodes then turned to Mrs.
Huffman and said, "Mr. Huffman is entirely rational
and competent, knows what he is doing, are you willing
to sign the deed?" and she answered yes. Then the
deed was signed, Mr. Huffman saying he was not able
to write, he touched the pen as Mr. Rodes made his
mark and Mrs. Huffman signed and they both acknow-
ledged it, then it was handed to Mr. Huffman and he
handed it to William.

Mrs. Huffman testified that her husband was for-
getful, that his physical sufferings rendered him help-
less and in her opinion he was not capable of making a
deed. Dr. McMurry who knew and well understood
his physical condition, his general breaking down,
speaking of his mental condition would venture no far-
ther than to say that "he was in no shape for a general
line of business. He was sufficiently rational to ap-
preciate what I said and give me a rational answer,
but to judge of the degree and strength and liability
I could not draw a line there hardly." The testimony
of defendant's witnesses showed that he was of as
sound mind as could be expected of a man of his age
and physical infirmities. He had passed his allotted
three score years and ten, and by reason of his strength
he had gone beyond that age, yet, in the language of
the Psalmist, his "strength was labor and sorrow."

We do not mean to say that there was no evidence
to support the plaintiff's claim. The evidence was
conflicting, but the chancellor who tried the case had a
better opportunity than we have to judge of the reli-
ance that ought to be placed in the testimony of each

witness.  He had the witnesses before him, he heard them and saw them, under examination and cross-examination, and it is the experience of all triers of the fact that the personal appearance and manner of the witnesses have much influence, and rightly so, in weighing the evidence and reaching a verdict.  It is our duty under such circumstances to defer to the findings of the trial judge and so we do in this case.

On the charge of undue influence there was no evidence, but the plaintiffs rely on what they consider was the fiduciary relation existing between father and son which they contend threw the burden of proof on the son.  The only evidence for plaintiffs on that point was that the old father and mother, when the former had become so helpless by reason of his physical infirmities that his every want had to be attended to by his wife, moved to their son's home.  What the purpose was, or at whose instance or request this move was made, we have only to surmise; giving the strongest inference in favor of the plaintiffs, we may surmise that it was on the invitation of the son, and if so, then, in the absence of any evidence tending to show a sinister motive, it was to his credit.  After the father had moved to the son's home the son attended to the renting of his farm for him and to the negotiating of a real estate loan; that is all he did in the way of attending to his business until we come to the transaction which is the subject of this suit.  It is but natural to presume that the son or his wife or both ministered to the wants and comfort of his father and mother while they were under his roof, that they at least relieved the mother of household duties that would have burdened her if she was living alone with her husband.  The mother who was hostile to this defendant in relation to this deed gave no hint of any conduct on his part that could be construed as imposing his influence on the old man.

In the brief of the learned counsel are cited many cases in this court in which it has been held that the circumstances in those cases created a fiduciary relation and cast the burden on him who claimed under the instrument in question to show that it was the fair and the free will of the maker. There is no disputing that proposition. But it is not every case in which an aged, sick and infirm parent who is under the ministering care of a son or daughter that raises such a presumption of undue influence as would justify the setting aside of a deed or will in the child's favor. [Bonsal v. Randall, 192 Mo. 525.] The old father in the case at bar could not attend to the renting of his farm or negotiating the loan, what then more natural than that he should ask the son in whose home he was living to attend to those things for him? The mother testified that she had heard nothing of the contemplation of making this deed until the arrival of the attorney. Why she was not informed of it, if in fact she was not, we do not know; if it was intentionally kept a secret from her it would be a suspicious circumstance; but she might have been mistaken about that fact or have forgotten it, because she herself was old and care-worn. The defendant could not explain, because one party to the contract in question being dead the other was incompetent as a witness. What passed between the father and the son that led to the son's going to town and employing the lawyer to write the deed we do not know, but we do know from the very satisfactory testimony of Mr. Rodes, whose testimony bears on its face the character of candor and intelligence, that Mr. Huffman was not surprised by the coming of the lawyer, he was expecting him and knew what he came for. When Mrs. Huffman expressed her opinion that her husband did not know what he was about to do, Mr. Rodes asked him questions in her presence on that subject and received answers that not only satis-

fied him but seemingly satisfied Mrs. Huffman also, because she then signed the deed. Whether it was the father who, realizing that his days were coming to a close, proposed to the son to go to the county seat and engage a lawyer to come out to the farm for this purpose, or the son proposed it to the father, we have no means of knowing, because, if the mother did not know, the only living person who did know was the son who was incompetent to testify, and therefore in the absence of evidence the only ground for plaintiff's contention is that a presumption arises in their favor on account of the supposed fiduciary relation casting the burden of proof on the defendant. If the burden of proof was on the defendant, the thing for him to prove was that the deed was an honest and fair transaction and that it expressed the free will of the grantor. If that burden was on him he has discharged it, he has shown that it was executed under circumstances free from suspicion and has also shown by several witnesses, reputable and intelligent, that the father, several years before this transaction, said that one-half this land belonged to William, that it was purchased to that extent with the proceeds of William's interest in the Illinois farm. We conclude, therefore, that the making of the deed was but a delayed act of justice; so the chancellor thought and so we think. The judgment is affirmed.

## DISSENTING OPINION.

WOODSON, J.—I am unable to lend my concurrence to the conclusions reached by the majority opinion delivered in this case, for the reason that I believe my brethren have overlooked some of the most important testimony and have failed to give proper weight to the entire evidence as disclosed by the record. The evidence bearing upon the mental and physical condition of the grantor, Jacob F. Huffman, at the time of the execution of the deed is as follows:

Rebecca Huffman, the widow of the grantor, Jacob F. Huffman, and the mother of defendant, W. T. Huffman, testified on behalf of plaintiff as follows:

"Q. How old are you, Mrs. Huffman? A. I am sixty-nine. Q. When did your husband die? A. He died on the 29th day of February, 1904. Q. How old was Jacob F. Huffman at the time of his death? A. I think he was seventy-four. Q. Mrs. Huffman, you may state to the court what the condition of Jacob F. Huffman's health had been for two or three years prior to the time of his death. A. He was very poorly with rheumatism. Q. Describe to the court if you can his condition? A. He was almost helpless, his hands were cramped, drawn up with it, his right eye was out, he had been paralyzed. Q. When was he paralyzed. A. '58; he kept growing worse. Q. Mrs. Huffman, after you moved from your farm here in September, the Dye farm, to the farm W. T. Huffman lived on, what was the condition of his health? A. Very poorly, suffering everything; he had asthma, heart trouble, rheumatism, and was growing bad every day. Q. I will ask you, Mrs. Huffman, who attended to his business, if any one, after you moved from the Dye farm out to W. T. Huffman's? A. Wm. T. Huffman. Q. That is the defendant in this case? A. Yes, sir. Q. Mrs. Huffman, do you remember the occasion when this deed was made from your husband and yourself to William T. Huffman—the deed in regard to the land in controversy, you remember the occasion of it? A. Yes, sir. Q. Do you remember the day when it was made? A. 23rd day of February, 1904. Q. You may state when you first ascertained or had any knowledge or information that there was to be a deed made and executed? A. I knew it when Wm. Huffman came to the door that afternoon, 23rd day of February, and drew the door open and said, 'Mr. Rodes has come.' I did not know then what he had come for. He came in. I invited him in, he asked 'how the old

gentleman was.' I told him very poorly—he was blind in both eyes. Q. How long had he been blind? A. About two weeks he had been blind, I think. Q. Now, what was his physical condition at that time? A. He was cold, his limbs were, he was very sick, could not eat, could not hold nothing in his hands to eat, I fed him, I waited on him in his weak condition. Q. Where was he when Mr. Rodes came in there, Mrs. Huffman? A. Propped up in his chair. Q. Why was he propped up in his chair? A. He was not able to sit up, not able to walk across the floor nor move his feet, his hands were all drawn and cramped up, he could not hold a spoon to feed himself. I fed him like a baby. Q. You may describe his condition mentally when Mr. Rodes came? A. It was very unbalanced, his mind was, his condition in every way. Q. Just describe now, Mrs. Huffman, his condition there, bodily, physically, his bodily condition when Mr. Rodes came there? A. He was very poorly. Q. Just describe it, Mrs. Huffman? A. I can't, it would kill me, he was sick and weak, could not hardly move. I waited on him like a baby. (Witness crying.)

"By counsel for plaintiff: You will have to compose yourself before you can testify in the case.

"Q. State his physical condition? A. Well, he was sick, his limbs were swollen and cold as ice, and sore, he could not see, he was blind, could not hear you speak to him scarcely, he did not know any one in the room, he would forget he ate his supper, or breakfast or dinner, and ask who I was when I come in and speak to him. Q. How long had his memory been in this condition? A. About two weeks. Q. How long had he been blind? A. About the same, two weeks, he could not see out of one eye and the other one—he could not see with either, he was perfectly blind. Q. How long, you spoke of his being affected with asthma a while ago, how long had he been afflicted with asthma? A. About eighteen months. Q. You may describe his con-

dition as to that disease to the court.  A. Well, he smothered, he lost his breath.  I would smoke with the asthma cure, sometimes I would smoke two hours before he, got any relief.  Q.  Where was he in the room when Mr. Rodes came there that day?  A.  Sitting in front of the stove at the foot of my bed, wrapped up in quilts and blankets.  Q.  State to the court why he was sitting up, if you know?  A.  He could not lie down, he could not breathe when I laid him down; he had heart trouble, kidney trouble and rheumatism and asthma.  Q.  You may state his mental condition that day?  A.  His mental condition was bad.  Q. Just state the facts now and describe to the court?  A. He could not remember anything scarcely at all, he never said anything, he never talked any that day at all; if I asked him anything he would not answer, all he wanted was a little milk.  Q.  How long had he been in this condition, he would not talk or have anything to say?  A. About a week as well as I remember.  Q.  Can you show the court the posture he was sitting in when Mr. Rodes came into the room?  A.  Sitting with his face in his hands that way (indicating) his elbows on his knees.  And I had wrapped him up and placed his feet on a chair so he could rest easy.  Q.  State to the court how long he remained in that position after Mr. Rodes came into the room.  A.  I laid his feet down after Mr. Rodes came in and put them on the floor on a cushion.  Q.  You spoke of his limb being sore, explain that to the court.  A.  His limb was sore, very, and it had gotten terribly offensive to dress it.  I had just gotten through dressing it when Mr. Rodes came and laid him down, but he had no feeling at all in his legs. Q.  Now, Mrs. Huffman, I will get you to state just what took place there after Mr. Rodes came that day, between Mr. Rodes and your husband and Wm. T. Huffman and yourself?  A. As far as Mr. Huffman was concerned he never said anything.  Q.  Mrs. Huffman, who do you refer to?  A.  My husband, Jacob F. Huff-

man.  Q.  Well, you may just state what took place?
A.  Mr. Rodes asked me when he came in how the old
gentleman was, I told him very bad, he did not have
anything to say, he said that was bad, 'I will shake
hands with the old gentleman when my hands become
warm.'  I told him he could not shake hands, he could
not grip anything, he was too feeble.  Q.  Well, go
ahead now?  A.  And he said he had come out there,
Mr. Wm. T. Huffman had requested him to come, and
wanted to know where he was.  I told him he was in
here a few minutes ago, he went out somewhere in the
yard, and he asked me to call him. I went to the door
and called him, he came in the house and Mr. Rodes
spoke to him, and he then commenced to write, Mr.
Rodes did, and William got up and walked out again,
and he asked me where he was, I went out to the door
again, I says 'Do you wish to see him?' he says, 'Yes,'
I went to the door, his wife was there, I told her we
wanted Will (interrupted)—

"By the COURT: Who was that, defendant's wife?
A.  Yes, sir, and I said 'he must come in and stay here,
Myrtle, I will not call him any more, he has got to
stay if he wants anything.'

"Q.  Go ahead now?  A.  And then Mr. Rodes
was writing and says, 'William, Mr. Will, I am now
ready for the lines of that 120 acres,' they went out on
the porch to give him the lines, he marked it off, I want-
ed to see too, I saw him tell him how the lines ran, saw
him tell him, William T. Huffman.

"Q.  The defendant in this case?  A.  Yes, sir,
that man sitting there, and it was leaking water, drip-
ped down off the roof, it dripped down upon Mr.
Rodes's book and spoiled it, William Huffman says,
'Now that spoiled it.'  'Oh, no, never mind,' Mr. Rodes
says, 'I can soon write another,' so they went back
and wrote it again, and then he read what he had writ-
ten about the lines, and he asked William if that was
right, he said it was, 'that was right (interrupted)—

"Q. And who asked Will, did you say? A. Mr. Rodes asked Will if that was right, he said it was, and then Will, he was sitting by the stove and I sat by Jacob F. Huffman, my husband, and he said, he read a few lines he had written about these lines, the 120 acres and the forty, he says then, 'Here is the lines, is that right?' he said 'yes.' Q. Who said 'Yes'? A. Will, William T. Huffman, the defendant you call him, and he says, 'Mrs. Huffman, you must sign it.' I says, 'No, I will not sign it, you didn't give me any improvements, that eighty acres and the twenty over on the right side of the road.' He said the eighty was the best of the three, that eighty was. Well, I said, 'It might be to somebody, but it ain't to me.' He wanted me to sign it, I told him I would not do it until Ed. Huffman was provided for. Then he turned round and asked Will what he thought about it. Then we wrangled and fussed a little and of course it was very unpleasant. I looked at my husband, he was sitting by my side. Q. I will ask you what, if anything, was said then in regard to your husband's ability to make a deed? A. I told him— Q. Told who? A. Told Mr. Rodes that he was not competent to make a deed, all three in there. Q. You told Mr. Rodes while William T. Huffman was in the room? A. Yes, sir, sitting right there. I told him he was not competent to make a deed, to sign a deed. He said he was. Q. Who said that? A. Mr. Rodes. Q. Well go on now, just state what took place? A. And I says, 'I can't sign it until you have Ed. provided for.' He said, 'How much do you claim for Ed.?' Q. Who said that? A. Mr. Rodes. I said $500 he had when he built his house on the Fisher farm we call it, the farm that Will occupied, and Ed. built at the time we sold to come here, and then I told Mr. Rodes he could not sign the deed for he could not hold a pen, 'I have to feed him and he can't see.' He says, 'I will hold his hand and let him make a dot or his mark.' Well, I says, 'It is illegal,

that is not legal,' and he did not like it, but I said it,
I said, 'Mr. Rodes, you know it is not legal to take a
man's deed now, for he ain't capable of making a deed.'
Well, we fussed a while and I looked at my husband,
he looked so poor and bad, and he was sitting there not
hearing or seeing anything at all, I just thought not to
have trouble, have no wrangling and fussing, I will
sign it. Q. Now, I will get you to state whether that
deed was read to you and your husband or not? A.
No, sir, it was not. Q. I will ask you if anything was
said to him in regard to signing the deed? A. Mr.
Rodes told him that he wanted him to sign it, but I
never heard Mr. Huffman say a word, I was right by
Mr. Rodes, he said he was willing but he was not, he
could not talk. Q. Did you hear or see him make any
sign as if he recognized what was going on? A. No,
sir, not that I saw. Q. Did you know that Mr. Rodes
was coming before he arrived there? A. No, sir. Q.
Did you know that anybody was coming to make a deed
that day to Wm. T. Huffman? A. Nobody at all.
Q. Did you know anything about any deed going to
be made there? A. No, sir, not then, I thought Mr.
Huffman was too far gone for anybody to think about
making a deed. Q. What, if anything, was paid that
day or any day after that time to Wm. T. Huffman
for the land? A. Nothing that I ever knew of. Q. Do
you know whether any notes were given or not? A. No,
sir; no, sir. Q. You are one of the administrators of
the estate? A. Yes, sir. Q. Was the deed read over
to Jacob F. Huffman after it was written? A. No,
sir; not that I know of, I was right there and never
heard it. Q. Did anybody explain to him what the
instrument was they were making there or anything of
the kind? A. No, sir, I don't think they did. Q. I
will get you to state whether or not he was in such
physical or mental condition that he could have under-
stood anything? A. I don't think he could. Q. I
will ask you, Mrs. Huffman, whether or not you had

moved all of your household and kitchen furniture from the lower place in September? A. Yes, sir. Q. I will ask you to state to the court if that was to be your permanent home? A. No, sir, it was not, no, sir. I told Mr. Huffman I would stay there until (interrupted)— Q. I will ask you whether or not you were living with your husband on this land that was deeded to Wm. T. Huffman at the date of his death? A. Yes, sir. Q. I will ask you to state whether or not that farm was rented to Wm. T. Huffman the year before that? A. Yes, sir, he rented it. Q. Do you remember the occasion of Dr. McMurry visiting your husband? A. Yes, sir, he was there on the 26th day of February. Q. The date of this deed was the 23rd day of February? A. Yes, sir. Q. Now, I will ask you, Mrs. Huffman, what was the physical and mental condition of your husband at the time Dr. McMurry was there as compared to the time that Mr. Rodes? A. Just the same about when Mr. Rodes took the acknowledgment as when Dr. McMurry was there. Q. Dr. McMurry here? A. Yes, sir. Q. When had Dr. McMurry been there before, do you know? A. Along in the fall, in September I think he was there—we got medicine from him all the time. Q. I will ask you, Mrs. Huffman, who took that deed that day, if you know? A. Mr. Rodes folded it up and handed it to Mr. Huffman, I can't tell you whether Mr. Huffman had it in his hands or not, I don't think he did, I saw his hands. Q. Which Mr. Huffman's? A. Jacob F. Huffman, will call him my husband, I did not see him do it, I saw Mr. Rodes hand Will the deed. Q. Saw Mr. Rodes hand Will the deed? A. Yes, sir, handed Will the deed.

"By the COURT: Did you see his hands? A. I saw Mr. Huffman's hands, but could not say the deed was ever in his hands, Mr. Rodes had it in his hand, he handed it to my husband, then handed it to Wm. T.

Huffman, Mr. Rodes I think I am correct, they was all in a bunch right there.

"Q. How did Mr. Rodes get hold of that deed? A. He folded it up—I never had my hands on it. Q. I will ask if you know who sent for Mr. Rodes to come out there? A. I think Will was there the day before, that would be the 22nd. Q. Where? A. In this town, and I never knew that Mr. Rodes was coming until that evening, late that evening, that Wm. T. Huffman opened my door and hollered in there, says, 'Mr. Rodes is coming,' and Mr. Huffman never moved. Q. I will ask you to state whether or not you have ever heard the defendant, Wm. T. Huffman, or did he say at the time he sent for T. T. Rodes? A. No, sir, never heard him say so, never heard him say anything about it. The deed never has been mentioned until now.

By the COURT: Did you have any conversation with your husband on the day of this convention? A. No, sir, he could not talk to no one, his tongue—he could not use his tongue."

Dr. McMurry, of lawful age, being duly sworn, testified on the part of plaintiffs as follows:

"Q. Where do you reside? A. Paris, Missouri. Q. What is your occupation? A. Physician. Q. How long have you been practicing medicine? A. About three years and a half. Q. Are you a graduate of any medical college? A. Yes, Washington Medical College. Q. Were you acquainted with Jacob F. Huffman in his lifetime? A. I was. Q. Was you ever called there as a physician? A. I was. Q. When was the last time you was there? A. February 26th, 1904. Q. What time in the day, doctor? A. It was late in the evening, I think it was dark before I left there. Q. I will ask you to describe the physical condition of Jacob F. Huffman at the time you was there? A. Well, he had been troubled for a number of years, I don't know how long, ever since I had known him,

however, with chronic rheumatism affecting the joints, the joints were enlarged, his hands and feet and toes were drawn, not only affecting those joints but other joints of the body, he had kidney trouble, chronic nephritis and then some sympathetic heart trouble, enlarged arteries, and do you want me to go into the history of the case as it was? Q. Yes, sir, just as you found it there on the 26th of February, what I had reference to, give the history as it had been since you had been his physician and on the 26th of February there? A. About a year or more before, I would not say definitely, at least a year anyway, he began to be troubled with asthma, and that gradually grew worse and I gave him medicine, good deal of the time he was unable to lie down and sleep. I think it was about the third to the last visit, which was in August, 1903, I visited him, that was when he lived right south of town here about two miles, he told me then how long it had been since he had been able to lie down, I don't remember though. His eyes were swollen very much and red, however, he could see with one eye, whether he could see with both or not I am unable to say. Then the next visit I made was along the first, forepart of September, 1903, his condition was practically along the same line though more advanced, he was troubled at that time also with his limbs swelling, his lower limbs were swollen, and the last visit was on February 26, 1904. When I arrived I went in the room, he was sitting up in a chair with his elbows on his knees and his head, his face, in his hands. I went in, I spoke to Mrs. Huffman I think in the other part of the house first and warmed I think, when I first went in he did not speak to me at all, but I went up to him and spoke to him and he spoke to me, that is all he said, I then said something to Mrs. Huffman and then directed my attention to Mr. Huffman, but he would answer me only when I would speak to him, I asked him how he was feeling, he did not raise up but said, 'Very bad, doctor, mighty

bad,' and his limbs at that time were cold up to his knees and also discolored, purple up about two-thirds of the way to the knee, I could feel no pulsation in the lower two-thirds of his leg—lower limb—in addition to that he was also suffering with an attack of la grippe. I did not take his temperature if I remember correctly, I examined his pulse. His heart action was not good at that time, it was ordinary, very ordinary, and sufficient to indicate poor circulation, his eyes, that is, the external appearance, swollen and red, he told me that he could not see, and I asked how long, but I forget how long, he said since he could see. Q. Do you know what caused—what affected his eyesight? A. Well, his eyesight had been failing for a number of years, I think, but the disease he had would naturally tend to impair the eyesight as well as the general condition of the body, and la grippe was present affecting the eyesight. Q. What effect did the disease he had have upon the brain, if any? A. The chronic rheumatism, the cause of rheumatism, whatever it may be, medical science has not discovered that yet, an enlargement of the arteries, an enlarged artery will not permit of proper circulation through any of the tissues and the lack of that proper circulation produces a malnutrition of the blood tissues all over the body. Q. I believe you said something about uraemic poison with the kidney trouble, did you? A. Well, there is always more uraemic secretion in the kidneys, not formed in the kidneys to the best of our knowledge, and usually in rheumatic trouble we find an increase of that uraemia. Q. What was his condition as to being troubled with that uraemia? A. Well, there was no symptoms of what we call uraemic convulsions or anything of that kind, no symptoms of what we call acute uraemia poison in his condition there at that time. Q. Doctor, from your observation of him that day and what conversation you carried on with him and examination you

made, what would you say as to his mental condition, as to whether or not in your opinion he was able to make contracts and transact ordinary business? A. He would only talk when I talked to him, and then give me very short answers, he seemed to understand what I said and I understood what he said, his answers were simply, 'Yes' or, 'No' or, 'Feeling very bad,' is about the extent of what he said. Q. You have not answered my question, I asked you whether or not in your opinion as a physician whether he was mentally able to make contracts and carry on ordinary business? A. Well, he was in no shape for a general line of business. He was sufficiently rational to appreciate what I said and give me a rational answer, but to judge of the degree and strength and liability, I could not draw a line there hardly.''

The foregoing was all of plaintiff's evidence regarding the physical and mental condition of the grantor, Jacob F. Huffman, at the time he executed the deed.

Defendant introduced the following testimony:

Jacob Schraeder, of lawful age, being duly sworn, testified on the part of defendant as follows:

"Q. Mr. Schraeder, where do you live? A. Well, it is about three-quarters of a mile from Wm. T. Huffman's. Q. From this land in controversy? A. Yes, sir. Q. How long have you resided there? A. Well, for fifty years. Q. Did you know Jacob F. Huffman in his lifetime? A. Yes, sir. Q. How long had you known him prior to his death? A. I don't know, I expect some four or five or six years. Q. Did you see him a short time prior to his death at Wm. T. Huffman's? A. I did. Q. At what times about now before his death? A. I was there Sunday afternoon, he died next Monday morning a week, if I recall right. Q. Next Monday week? A. Yes, sir. Q. Do you know how long before the time he made this deed? A. Sunday before the deed was made on Tuesday I think.

Q. Did you see Mr. Huffman? A. Yes, sir, I saw him in the room where he was. Q. Did you talk with him? A. Yes, sir. Q. Tell the court what his condition was physically? A. He seemed to be suffering considerably with asthma, he said he was suffering with his eyes and head, he had his elbows down on his knees and his hands over his face. Q. You say that was Sunday before he died? A. Sunday week before he died, he died Monday morning. Q. Sunday before the Tuesday, the day the deed was made? A. Yes, sir. Q. Just go ahead and state what you saw of him? A. I saw he seemed to be suffering, I talked to him, I don't know how long, may be, perhaps, may be in the room two hours, may be more, I went on purpose to see him. Q. Tell the court what you talked about? A. Just talked about the matters in general on the farm, one of the things, we talked about rats through the country eating up all our corn. He just remarked, 'Will is losing enough corn, rats eating up enough, to feed 100 head of cattle.' Conversation just at that time, just on the farm. Q. General topics? A. Yes, sir, nothing in particular at all. Q. State what his mental condition was at that time. A. His mental condition just as good as I had ever seen it, although suffering, taking that in consideration he might not be as well, though he seemed to talk as rational as I had ever heard him talk. He seemed to be suffering with his eyes and head and said he was feeling bad.

*"Cross-Examination.*

"Q. Did Mr. Huffman remain in the position you described? A. Only when I shook hands with him, he handed me his hand, it was drawn that way (indicating). Q. He sat with his head in his hands? A. Yes, sir, he said he was suffering with his head and eyes. Q. Said rats were eating enough corn to feed a 100 head of cattle? A. Yes, sir. Q. Do you think

that day you saw Mr. Huffman there he was in a condition to do business? A. Yes, sir. Q. He could have gotten out and attended to business? A. I don't know whether he could have gotten out, he was capable of attending to business in the house there, I did not see him get up or anything like that, but I was there Sunday before that, he was up and around and walked about, I say, two weeks before I was there on Sunday evening, he was able to be up and walk around the house and went out of the house. Q. You say the Sunday before? A. Two weeks before he was able to walk out doors. Q. Then he raised his head up in his hands when he shook hands? A. Did not, only reach out one hand. Q. How long did you stay there? A. I suppose I was there two hours. Q. He stayed in that position all the time you were there? A. Yes, sir.''

Mrs. Mary E. Cadle, of lawful age, being duly sworn, testified on the part of defendant as follows:

''Q. Give your name to the reporter please? A. Mary E. Cadle. Q. Where do you reside? A. One-half mile west of Will Huffman's. Q. How long have you resided there? A. I have lived there about ten years. Q. Did you know Jacob F. Huffman in his lifetime? A. Yes, sir. Q. How long had you known him? A. About six years. Q. Do you know how soon after you moved back did you see Jacob F. Huffman? A. I saw him on New Year's day and was with him there a week. Q. Where was that? A. At Will Huffman's. Q. That was when you were back? A. No, come back to stay, we was waiting to get possession of our place. Q. You moved on your farm the first of February? A. Yes, sir, I was at Wm. Huffman's visiting. Q. What was Jacob F. Huffman's condition that week you were there? A. Well, he was crippled up. Q. Had the rheumatism? A. Yes, sir. Q. What about his mind, did you notice? A. His mind seemed all right to me. Q. About his conversa-

tion, state about his conversation? A. Well, he talked to me like he always did. Ask him 'How do you feel?' he would say, 'Well, feeling bad,' or 'feeling pretty bad.' Q. Well, do you know when he died? A. Well, yes. Q. About when? A. I don't know just the day of the month. Q. How long before that you had seen him? A. Evening before at 7 o'clock. Q. Evening before he died? A. Yes, sir. Q. Now when were you there prior to that time? A. I was there Thursday and Friday. Q. What was his condition Thursday and Friday? A. Well, just crippled up with rheumatism, that is all I could tell. Q. What about his mind? A. Well, I could not notice anything about his mind being wrong, his mind seemed all right to me. Q. Did you have any conversation with him? A. Only just 'Good-morning' when I would go in, he would shake hands with me, and call me 'Mrs. Cadle.' I asked him how he was feeling, he would say he was feeling pretty bad sometimes, that would be about all. Q. Was he sitting in the house? A. Why, yes. Q. Now, you said you saw him on Sunday, did you have any conversation with him? A. When I went to leave I went in and shook hands and said, 'Good-bye, uncle Jacob,' he said, 'Good-bye, Mrs. Cadle, come back soon,' that is all he said.

### "Cross-Examination.

"Q. You said nothing to him on Thursday, Friday, Saturday or Sunday except just to speak to him? A. Just go in the room and say, 'How do you do,' and call him 'uncle Jacob' and he would say, 'Good morning, Mrs. Cadle,' and I would ask him how he was feeling. Q. Was he blind then? A. I don't know whether he was blind or not. Q. You don't know whether he was or not? A. No, sir. Q. What position was he in then? A. Head over with his hands up this way (indicating) sometimes, and sometimes over

this way. Q. His wife was there in the room with him all the time? A. No, sir; not all the time, but going back and forwards. Q. Who waited on him? A. Well, his wife some, I think they all waited on him. Q. Mrs. Huffman, Rebecca Huffman, stayed in there most of the time? A. Yes. Q. Did you have any conversation with him other than the three days before he died, Thursday, Friday, Saturday and Sunday, four days? A. Nothing, only just go in and say how do you do, and ask him how he was. Q. As you passed in and out of the room did you hear him say anything with anybody, carry on any conversation? A. Nobody to carry on one with but him and I and Mrs. Huffman. Q. Did you hear him carry on a conversation with his wife? A. Only just when he wanted a drink, ask for water, when I was in there I would get it. Q. How long before that Thursday when you saw him? A. The Sunday before that. Q. About the same condition that he was on Thursday? A. I did not see any difference in him. Q. You did not see any difference on Saturday and Sunday before he died? A. Well, only just he seemed a little bit weaker; did not walk around that day any. Q. Walked around Sunday? A. He walked the week before that Sunday I was there. Q. What day of the week? A. I don't know just exactly. Q. When was you there before that time? A. I was there on New Year's day, and he walked then. Q. He walked then? A. Yes, sir. Q. Do you know anything about the condition of his limbs? A. They was swollen up and cold. Q. You did not know he was blind then? A. No, I did not know he was blind. Q. You did not know that? A. No, sir. Q. You did not know what condition his mind was in, you did not talk to him? A. Yes, sir, I did talk to him, I always asked how he felt. Q. You never entered into a conversation with him? A. Not with him

about his business. Q. Well, about anything except speak to him and ask him how he was? A. I would talk to him and ask him how he was feeling every day."

Will B. Schraeder, of lawful age, being duly sworn testified on the part of defendant as follows:

"Q. Your name is Will B. Schraeder? A. Yes, sir. Q. You are a son of Jacob Schraeder? A. No, sir. Q. Who is your father? A. Tom Schraeder. Q. Mr. Schraeder, did you know Jacob F. Huffman in his lifetime? A. Yes, sir. Q. How close did you live to him? A. Why, about a half a mile the houses are apart. Q. Did you visit him during his last illness? A. Yes, sir. Q. How long did you see him before he died? A. I was there on Saturday and he died early Sunday morning. Q. Wasn't it Monday morning? A. Let me see, yes, sir, Monday morning. Q. Well, did you stay there with him? A. Yes, sir, I stay up that night. Q. Tell the court there what his mental condition was at that time? A. Well, he was, seemed pretty feeble, sat up in a chair, did not have much to say, only when Will Huffman would speak to him, ask him what he wanted, he would tell him what he wanted or if he did not want anything he would say, 'No.' Q. He sat up in a chair? A. Yes, sir. Q. You waited on him any did you while there? A. Well, no, sir. Q. You was there with him? A. Yes, sir. Q. When had you seen him next before that Saturday night? A. Well, I could not exactly state the time, it was some, quite a while, I was helping gather corn that fall. Q. Had not seen him since that time? A. No, sir.

"*Cross-Examination.*

"Q. Did not say anything only when Will Huffman would go and ask what he wanted? A. Answer Mr. Huffman's questions. Q. Just say 'yes' or 'no.' A. Yes, or tell him what he wanted if he wanted any-

thing. Q. You could not tell anything about the con-
dition of his mind, not having any conversation with
him? A. He answered very rational. Q. You had
no conversation with him though? A. No, sir, I had
no conversation with him. Q. You was in there all
night? A. Biggest portion of the night, yes, sir. Q.
You said nothing to him or him to you? A. No, sir,
I don't believe I even spoke to him, he seemed to be
asleep when I went in, I did not bother him. Q. Just
sat up there with his head in his hands, show the
position? A. Head over this way, hand down this
way one of them (indicating). Q. Just sat up all the
time? A. Yes, sir.''

T. T. Rodes, of lawful age, being duly sworn, test-
ified on the part of defendant as follows:

''Q. You may state your name in full, residence
and occupation. A. T. T. Rodes, residence Paris,
Missouri, occupation, lawyer. Q. How long have you
been engaged in the practice of law? A. Since '85.
Q. I will get you to state whether or not you are ac-
quainted with the defendant in this suit, Wm. T. Huff-
man? A. I am. Q. How long have you known him?
A. I think about a year last August, Mr. Whitecotton,
I have known him by sight quite a while. Q. Did you
know Jacob F. Huffman? A. Yes, sir. Q. How long
did you know him? A. I have known him since the
summer of 1900. Q. Since 1900? A. Yes, sir. Q. I
will get you to state to the court, Mr. Rodes, whether
or not you ever had any conversation with him, in
which he made any statement as to the ownership of
this 240 acres of land prior to the making of the deed?
A. I did. Q. Tell the court what it was? A. I never
was associated with Jacob F. Huffman as an attorney
in any instance. Q. At any time? A. No, sir. Q.
When did you see him again following that? A. It
was the 23rd day of February, 1903. Q. Well, you
may state where you found him? A. George T. Huff-
man came to my office the day prior to the making of

this deed, no, W. T. Huffman told me his father wanted to make a deed, said to me, 'You come out to-morrow afternoon to fix the papers.' I said to him, 'Won't to-morrow morning do as well, I have got to go to Moberly?' He says, 'No, you come out to-morrow afternoon.' He said, 'My father is suffering from asthma, he does not sleep at night and what rest he has is in the morning, and I don't want him disturbed in the morning, you come out in the afternoon.' I told him, 'All right, I will be out to-morrow afternoon.' I started out there, I got out to the south part of town I found a little branch running very swift, great deal of water passing, I found I could not cross at Elk Fork, which is direct route to Mr. Huffman's, and made inquiry of parties and found it was past fording. I then had to go round by the Mexico Bridge to Turkey Creek and get in Mr. Huffman's road as soon as possible. I crossed at the Mexico Bridge and got to Turkey Creek and found that past fording, then that caused me to go six or seven miles out of the way to get to Mr. Huffman's residence, which made it very late in the afternoon getting there. Mr. Wm. T. Huffman met me at the fence. As I said Wm. T. Huffman met me at the fence, and went with me to the door, where his father and mother, in the room where his mother and father were, and as I re-call it he went in the room with me and immediately passed on at the southwest corner of the room. I was very much chilled and sat there a little while warming by the stove, as soon as I got sufficiently warm I turned to Mr. Huffman and said—

"THE COURT: Who was in the room at that time? A. Jacob F. Huffman and his wife Rebecca Huffman and myself only. I turned to Mr. Huffman and said to him, 'It is growing late, and I expect we had better get about that business.' I said, 'What land is it you wanted deeded to William?' He said, 'I want you to deed all of this land to William that is unencumbered.'

I told him that I knew the numbers of the land and could prepare the deed. I prepared the deed, putting in the names of the parties, got down to the point where it was necessary for the consideration, I turned to Jacob F. Huffman and says, 'Mr. Huffman, what consideration do you want put in this deed?' He said, '$40, just what the land cost,' naming the number of years ago when he bought it, the number of years I don't now recall—five or six years. I completed the deed with the exception of the taxes. I asked about the taxes, he said he did not want to pay any more taxes—all future taxes were then excepted. I then turned to Mrs. Rebecca Huffman and asked if she was willing to sign the deed. She said, 'No, Mr. Rodes, this is all new to me, they never talked business before me and I don't know anything about it,' says, 'There has been a mistake in the place that gave Will the house.' I told her I did not know the lines. They could show it to me. She stepped to the door and called Wm. T. Huffman in the room. I told him that I wanted to see the lines of the land that I was deeding and he and I stepped out of the northwest door, he pointed out the lines to me. While out there it was raining and dripped through the leak in the porch and fell on the deed I had prepared and spoiled it. I returned and told Mrs. Huffman the result of my investigation, also said that the deed that I had made was spoiled and I would have to re-write it. Wm. T. Huffman went out of the room immediately. I prepared another deed just like the one that had been spoiled by the water being splashed on it. I made it the same in every respect, the land, consideration and everything else. I again asked Mrs. Huffman if she was willing to sign the deed. She said, 'Mr. Rodes, I think Eddie ought to be provided for.' She said that 'Eddie built a house on our farm in Illinois and I think he is entitled to something.' I said, 'I know nothing about that; how much do you think your son

Eddie ought to have?' 'I think he ought to have as much as $250.' I says, 'Call W. T. Huffman and talk the matter over and see if you can adjust the matter as to what Eddie ought to have,' and she stepped to the door and called Mr. Huffman, 'Will, I wish you would stay in here, you are needed.' He came in, took his seat near the stove. Mrs. Huffman was sitting in the east part of the room. Mr. Jacob F. Huffman sat at the foot of the bed about ten or twelve feet from Mrs. Rebecca Huffman, and I occupied a place near the west side of the house near a window, then Will Huffman and his mother begun discussing their affairs in Illinois, Mrs. Huffman taking the position that Eddie built the house there and ought to have something for it. W. T. Huffman maintaining his side said, 'The house Eddie built was no account. I had to build two other rooms, it was no account and very small and I completed that, building other rooms, built the corn-crib and other buildings, barn, etc.' They had it there for some time talking back and forth in regard to Eddie's rights. During a lull in the conversation Jacob Huffman spoke up and says, 'Eddie has forfeited any rights he may have had there by leaving and going to California.' That is the only time he took any part in the conversation when not directly addressed. After they got through talking, no conclusion was agreed to between them as to Eddie's rights, I again said to Mrs. Huffman, 'Are you willing to sign the deed?' She said, 'Mr. Rodes, it ain't legal.' She says, 'My husband ain't able to make a deed.' I says, 'Mrs. Huffman that is no fight of yours, your husband is competent and knows what he is about.' I says, 'If you have any doubt in regard to it I will hold a conversation with him in your presence.' I then moved my chair over there to where Mr. Huffman was sitting, Jacob Huffman. I says to Mr. Huffman, 'Do you know who I am?' He says, 'Yes, Friend Rodes,' he called me Friend Rodes. 'Do

you know what I came out here for.' He says, 'Yes.' 'What was it?' 'To make a deed to William.' I says, 'Do you want that deed made.' 'I do.' I said to Mr. Huffman, 'Do you remember a conversation you had with me in my office in the fall of 1900, in which you told me that Wm. T. Huffman owned a half interest in this prairie farm?' He said, 'I do.' I said, 'Do you recall that you stated that you expected to make him a deed?' He said, 'I do.' I says, 'Is it your wish that the deed now be made?' He said, 'It is.' I then turned to Mrs. Huffman, I said, 'Mrs. Huffman, Mr. Huffman is entirely rational and competent, knows what he is doing, are you willing to sign this deed?' She says, 'Yes.' I asked him if he was able to sign his name. He said he was not. I wrote his name and went to where he was and had him to touch the end of the pen to make a cross. I asked him if that was his free act and deed for the uses and purposes therein mentioned. He said it was. I did attest his signature by signing it myself. I then again returned to Mrs. Huffman and asked if she was willing to sign the deed; she said she was, but could not see where she was. She then come to where I was sitting and signed it. I then took her acknowledgment, asked her if that was her free act and deed and she said it was. I then took it to Jacob F. Huffman, handed it to him, he took it in his right hand. I says, 'Mr. Huffman, here is the deed to this land to Wm. T. Huffman.' I says, 'If you want him to have the deed, it is your duty to deliver it to him.' He shifted it from his right hand to his left, and held it out in the direction where Wm. T. Huffman was sitting. Wm. T. Huffman come and got the deed. I said to Jacob F. Huffman, 'Will now has the deed, is that your wish?' He said, 'It is.' I then prepared myself and left. I will further say that Wm. T. Huffman paid me for my services for going there.

"MR. BODINE, counsel for plaintiffs: Q. Did he employ you? Did Wm. T. Huffman employ you to come out there and make that deed? A. He paid me for my trip out there.

"Examination continued by Mr. Whitecotton:

"Q. I hand the witness Exhibit 1, and get you to state what is that if you know? A. Yes, sir, it is a deed from Jacob F. Huffman and Rebecca Huffman to W. T. Huffman to 120 acres of land. Q. I will ask you if that is the deed you have referred to in speaking of deed? A. It is.

*"Cross-Examination.*

"Q. Now, when there was objections offered to the making of that deed you did everything you could to get Mrs. Huffman to sign and remove all difficulties in the way, did you not? A. I have stated the entire transaction as I remember it, Mr. Boyd. Q. Now you said you told Mrs. Huffman that it was no concern of hers, or what did you say? A. I said when she said to me, 'Mr. Huffman was not capable of transacting business' (interrupted)— Q. What did you tell her? A. I said, 'Mrs. Huffman, that is none of your fight, your husband is competent, knows perfectly what he is doing'; 'none of her fight' I think is what I said. Q. You are a lawyer, Mr. Rodes? A. Yes, sir. Q. And you told her that it was no concern of hers, didn't you know that if she put her name to that deed it would pass her interest? A. I knew if she deeded it correctly it would. Q. She knew you were a lawyer did she, she knew you were practicing? A. I don't know whether she knew it or not. I only met Mrs. Huffman three times, I met her once at home on the Dry Farm when I took her acknowledgment, and met her at the home of W. T. Huffman when I took her acknowledgment to a mortgage, and met her this third time at Wm. Huffman's. Q. Did she know you were

practicing here in Paris and practicing law? ` A. She did not hear it from me, I don't know what she knew, Mr. Boyd. Q. She had met you several times? A. Never been in my office. Q. Met you several times? A. Those three times. Q. You knew all the rest of this land was mortgaged. A. I did. Q. You are an attorney in this case, Mr. Rodes? A. Yes, sir. Q. And you have been the legal adviser of Wm. T. Huffman from the time this deed was executed until the present time? A. Have been the legal adviser of Mr. W. Huffman since the death of his father in connection with Mr. Whitecotton. Q. He paid you for your services in connection with the execution of this deed? A. I said he did. Q. At the time that Mrs. Huffman said her husband was not capable of making a deed, what did Mr. Huffman say? A. Which Mr. Huffman, the old gentleman? Q. Yes. A. The old gentleman did not say anything. Q. He heard it. A. Yes, sir, because the conversation was spoken no lower than the conversation between Wm. T. Huffman and his mother—he heard that—I suppose he heard this. I heard her words in that conversation. Q. You said he heard it? A. It was about in the same tone, I presume he did, he heard this other. I will say in that connection, I think that the mind of Jacob F. Huffman was as usual at that time, and I was more particular from that time than I would have been had not Mrs. Huffman raised the point. Q. On account of that you instructed him to take it in his hand and deliver it, why did you do that? A. I sometimes do it, because Mrs. Huffman had made objection and I wanted to take all necessary steps. Q. In the interest of Wm. T. Huffman? A. In the interest of all parties concerned. Q. And it was in the interest of all parties concerned, no doubt, that you advised Mrs. Huffman that her objection was of no value, none of her affairs or concern? A. Draw your own inference, I have stated the conversation. Mr. Boyd, she

was in the attitude of resisting in making the objection that she did, first that he was incompetent, and then about Eddie, and then about her husband's mind. Q. And you were there in the interest of Wm. T. Huffman? A. No more in the interest of Wm. T. Huffman I suppose when I went out there at the request of Jacob F. Huffman to make that deed. Q. It appeared that she knew nothing about it? A. She said she knew nothing about it, 'They never talk business before me. I know nothing about this matter, it is all new to me.' "

With great care and in my judgment with perfect accuracy I have selected and literally copied every word of the evidence as disclosed by this record bearing upon or tending to show the physical condition and the mental capacity of Jacob F. Huffman to make a deed on the date and prior to the time when the deed in question was executed.

When we strip the real issue involved in this case of all collateral matters, it resolves itself into the question, Was the mental capacity of Jacob F. Huffman on February 23, 1904, sufficient to enable him to execute a valid deed? That question is sharply drawn. Counsel for plaintiffs earnestly contend that Jacob F. Huffman upon that day did not possess sufficient mental capacity to make a valid deed, while counsel upon the other side with equal earnestness insist that he did possess that capacity.

That question must be weighed and determined by all the facts and circumstances as shown by the evidence. The two main witnesses, as I conceive it, who testified in the cause were Rebecca Huffman, the widow of Jacob Huffman, and one of the plaintiffs in the case, and the other is T. T. Rodes, the attorney who drew the deed, and one of the attorneys for the defendant in this cause.

We will first view her testimony in the light of the corroborative facts and circumstances, and then

we will consider his testimony in view of the same light. We will first consider the evidence as it bears upon the grantor's physical condition, and then discuss its bearing and effect upon his mental capacity.

In brief Rebecca Huffman testified as follows: Jacob Huffman at the time of making the deed was seventy-five years of age; that for two or three years prior to his death his health had been very poor and he had suffered greatly with rheumatism and was almost helpless, his hands were cramped, drawn up from its effects, his right eye was out and he had been paralyzed since 1858, and he grew worse all the time. That she and her husband Jacob Huffman moved to the home of defendant in September, 1903, and he died February 29, 1904; that while residing there his health was very poor, suffering everything, asthma, heart trouble, rheumatism, and he grew worse every day. That during the last two weeks of his life his limbs were cold, he was very sick, could not eat, could not hold anything in his hands to eat; that she had to feed him, and waited on him during his weak condition the same as she would wait upon a baby. He could not lie down, could not sleep in bed but had to be propped up in a chair, day and night; that he was not able to sit alone but had to be propped up; could not walk across the floor nor move his feet; that his hands were all drawn and cramped up, and could not hold a spoon to feed himself. That when asked to describe his physical condition in detail, she broke down crying, and said she could not do so as it would kill her. But when pressed for an answer she said, he was sick, his limbs were swollen and cold as ice; that one of them was sore and that its condition was such that it was terribly offensive to dress and care for it; that he could not see; that he was totally blind in one eye, if not in both, and could scarcely hear anyone speak to him; that he did not recognize anyone in the room, and would forget that he had eaten his meals; that

when she would go up to him and speak he would ask who she was. His memory and eyesight had been in that condition for about two weeks prior to his death, and he had suffered from asthma for about eighteen months, breathed with great difficulty; sometimes she would have to smoke the "asthma cure" for two hours before he could get relief. That on account of the asthma and his heart and kidney troubles he could not lie down and breathe. That she had to keep him propped up in a chair wrapped in blankets, with his feet resting upon a chair or cushion. That was his condition when Mr. Rodes came to draw the deed. That she had just gotten through dressing his limb when he came in.

Dr. McMurry, the family physician's testimony was briefly as follows:

That he had not visited Jacob Huffman since sometime in August or September, 1903, until the 26th of February, 1904, three days after the deed had been executed and three days before his death, which occurred February 29th. That Huffman had been troubled for years with chronic rheumatism, affecting the joints, they were enlarged, his hands, feet and toes were drawn, he had kidney trouble, chronic nephritis and some sympathetic heart trouble, enlarged arteries. About a year prior to his death he began to be troubled with asthma and gradually grew worse until he was unable to lie down to sleep in rest. In August, 1903, he visited him and found that his eyes were swollen very much and red, however he could see with one eye. That in September he visited him and found his condition practically the same, though more advanced. That his last visit was on February 26, 1904. That when he reached Mr. Huffman's room he found him sitting up in a chair with his elbows on his knees and his face resting in his hands. When he went in Mr. Huffman did not speak to him, and, after warming, the doctor went up and spoke to him and he spoke

to the doctor, and that was all he said; that he would
only speak when the latter would speak to him; that
he asked him how he was feeling, and without changing
his position he said, "Very bad, Doctor, mighty bad;"
that at that time his limbs were cold up to his knees
and also discolored, purple up about two-thirds of
the way to the knees; that he could feel no pulsation
in the lower two-thirds of his legs, and in addition
to that he was suffering with an attack of la grippe.
That he examined his pulse, his heart action, which
was not good, and his circulation was poor; that his
eyes were red and swollen and he said "that he could
not see." That he asked him how long it had been
since he was able to see, and he stated the time, but
had forgotten what his answer was. His eye-sight
had been failing for a number of years and the dis-
eases he had would naturally impair his sight, as well
as the general condition of his body. That the rheuma-
tism caused the enlargement of the arteries, which
prevents proper circulation through the tissues of the
body and produces malnutrition of the blood, tissue
and other portions of the body. He also had more or
less uraemic poison caused by his kidney trouble but
no uraemic convulsions or acute uraemic poison at
that time.

The foregoing is the pith and substance of plain-
tiffs' evidence regarding Jacob Huffman's physical
condition at the time he executed the deed in ques-
tion.

Now let us briefly state the testimony of defend-
ant's witnesses upon that point. It is as follows:

T. T. Rodes testified as follows: That he was a
practicing attorney at Paris, Mo., and knew William
and Jacob Huffman, the latter since the summer of
1900, when he assisted him in negotiating a loan upon
his farm. That he saw him but a few times after
that. That the last time was on February 23, 1904,
when he went to his home to draw the deed in question.

That William Huffman said his father wanted him to go out and draw the deed, and that he went out in pursuance to that request and drew the deed. That Mr. Huffman was not physically able to sign the deed and that he, Rodes, held the pen while Huffman touched the pen, and then the former signed and witnessed the latter's signature.

Jacob Schraeder testified that he had known Jacob Huffman five or six years. That he was at his home eight or nine days prior to his death. "Q. Tell the court what his condition was physically? A. He seemed to be suffering considerably with asthma; he said he was suffering with his eyes and head, he had his elbows on his knees and had his hands over his face. Q. Just go ahead and state what you saw of him. A. I saw he seemed to be suffering. I talked to him I don't know how long, maybe—perhaps—maybe in the room two hours, may be more. I went on purpose to see him. Q. Tell the court what you talked about. A. Just talked about matters in general on the farm, one of the things we talked about was rats through the country eating up all our corn, he just remarked, 'Will is losing enough corn, rats eating it up, enough to feed one hundred head of cattle,' conversation just at that time, just on the farm. Q. General topics? A. Yes, sir, nothing in particular at all." On cross-examination he testified that Huffman's hands were drawn up and had to shake hands with him that way (indicating). He had his head in his hands and "he was suffering with his head and eyes." He said "rats were eating up enough corn to feed one hundred head of cattle." That he did not know whether Mr. Huffman could have gotten out of the house or not, did not see him get up or do anything, but the Sunday prior to that, which was two weeks before the deed was made, he was able to be up and went out of the house.

Mrs. Cadle testified as follows: That she had known Mr. Huffman about six years but had not seen him for some months prior to February, 1904. That she saw him during that month, and he was crippled up with rheumatism. He talked like he always did. That when she would ask him how he left he would reply, "Well, feeling badly," or "Feeling pretty bad." On cross-examination she said that she saw him Thursday, Friday, Saturday and Sunday before his death. That when she would go in she would call him uncle Jacob and he would say, "Good morning, Mrs. Cadle," and I would ask him how he was feeling and he would say "Feeling poorly" or "pretty bad." That she did not know and could not tell whether he was blind at that time or not. He held his head over and his hands up this way (indicating) and sometimes over this way. His wife and all of them waited on him. That she had no conversation with him during any of those days except go in and say how do you do and ask him how he was, and never heard him carry on any conversation. That she never entered into a conversation with him.

Wm. B. Schraeder testified as follows: That he was at the home of Jacob Huffman on Saturday and that he died the following Monday morning. That he sat up there that night. "Q. Tell the court there what his mental condition was at that time. A. Well he was, seemed pretty feeble, sat up in a chair, did not have much to say only when Will Huffman would speak to him, ask him what he wanted, he would tell him what he wanted, or if he did not want anything he would say 'no.'" On cross-examination he testified that he said nothing only when Will Huffman would ask him what he wanted, and in answer he would just say "yes" or "no." That he had no conversation with Mr. Huffman nor speak to him. That he was sitting in his chair seemingly asleep with his head in his hands (showing the position).

All of this evidence conclusively shows that during the last two weeks of Jacob Huffman's earthly existence he was afflicted with most of the ills that the flesh of man is heir to, and there is no conflict whatever between the testimony of the witnesses who testified on behalf of plaintiffs and those who were called on behalf of defendant as to the extreme seriousness of his condition, and that life was suspended by a slender thread over the invisible line which separates life from death. The surprising part of this drama to me is, how was it possible for him to thus linger so long at the very threshold of death? He was practically blind, his eyes red and swollen, his hearing greatly impaired, his heart and kidneys had long ceased to properly perform their proper functions; a stroke of paralysis in 1858 struck and shattered his nervous system and continued to grow worse until death relieved him; rheumatism was mistress of his muscles, sinews and joints, and had drawn his hands, fingers and toes into shapeless appendages, and his joints were swollen into irregular shapes and knots; the arterial system had become enlarged, thereby preventing proper circulation of the blood and withheld nourishment from the various portions and tissues of the body; and asthma had taken possession of and had long resided within his bronchial tubes, and little by little and day by day choked off from him the breath of life. The combined effect of all of those ravages were first to deprive him of his rest and sleep, his food and nourishment, to fill his system with poisonous acids; and, secondly, to produce sickness, pain, immobility and death.

By these comments upon the evidence I have accentuated the seriousness of Mr. Huffman's sickness and the extremities in which he existed during the last two weeks of his life, but have in no manner exaggerated either.

As before stated, there is no conflict in the testimony regarding the foregoing matters. That given by the witnesses for defendant points to the same results as that given by those who testified for plaintiffs; the only difference consists in the amount of testimony given by the former and not as to the direction in which it points, nor the facts which it tends to prove. That, however, was natural, and is explainable by the fact that the former witnesses, the wife and physician of Jacob Huffman, were closer in touch with him, administering unto his wants, thereby giving them better opportunities of observing and knowing his true condition than that possessed by the witnesses who testified for defendant.

Having pointed out, it seems to us, with a high degree of certainty what the physical condition of Jacob Huffman was on the day he executed the deed and what it had been for sometime prior thereto and up to the date of his death, we will now review and weigh the evidence and see what his mental condition was during that same period of time, and by the light thereof try and determine whether or not he possessed sufficient mental capacity to execute the deed in question.

The evidence for plaintiffs upon that question as disclosed by the evidence is as follows:

Mrs. Rebecca Huffman testified as follows: That when Mr. Rodes came to draw the deed Mr. Huffman's mental condition was very poor and his mind was unbalanced, and he did not know any one in the room, he would forget he had eaten his meals and ask who she was when she would go and speak to him. He had been in that mental condition for about two weeks before he died. He could not remember anything scarcely at all. He never talked any that day, and if she asked him questions he would not

answer her, and all he wanted was a little milk; that he had not talked any for about a week before Mr. Rodes came. That when Mr. Rodes requested her to sign the deed, she, at first, refused to do so, and told him that her husband was not competent to make a deed, and that Mr. Rodes said "he was." That she told him her husband could not sign the deed for he could not hold a pen, as she had to feed him and that he cannot see; that in reply he said, "Well, I will hold his hand and let him make a dot or his mark," that she then said to him, "It is illegal and you know it is not legal to take a man's deed when he is not capable of making a deed." Mr. Rodes's face flushed for a while and then she looked at her husband and saw that he looked so poor and bad, sitting there not hearing or seeing anything, so she just thought she would sign it so as to have no trouble, wrangling or fussing about it. He never read the deed to Mr. Huffman but told him that he wanted him to sign it, but I never heard Mr. Huffman say anything in reply; that he did not know or understand what was being done.

Dr. McMurry testified that on the last day, February 23rd, he visited Mr. Huffman he would only talk when the latter would ask questions, and would then give him very short answers, but seemed to understand what was said to him, and his answers were simply "yes or no," or "feeling very badly." That was the extent of the conversation held with him. He was in no shape to transact a general business. He was sufficiently rational to appreciate what he said to him, but he was not able to judge of the degree and strength of Mr. Huffman's mind.

The defendant introduced the following testimony regarding his mental condition upon that day:

Jacob Schraeder testified that he had known Mr. Huffman five or six years prior to his death, which occurred on Monday morning, February 29, 1904; that

the last time he saw him before his death was the second Sunday prior thereto, and which was the Sunday before the deed was executed. That he was there about two hours and Mr. Huffman was "suffering considerably with asthma and he said he was suffering with his eyes and head, and he had his elbows on his knees and his head resting in his hands and had his hands over his face." That he talked to Mr. Huffman about matters in general on the farm, one of the things talked about was the rats through the country eating up all the corn, and Mr. Huffman remarked, "Will is losing enough corn by rats eating it up to feed one hundred head of cattle." That in his judgment Mr. Huffman's mental condition was as good as he had ever seen it, although suffering, taking that in consideration he might not be so well, though he seemed to talk as rational as he had ever heard him talk. He seemed to be suffering with his eyes and head and said "he was feeling badly." On cross-examination he testified that two weeks before his last visit to Mr. Huffman's he was at his home and the latter was able to be up and walked around the house and went out doors. That he did not know whether he could have gotten out or not during his last visit but he was capable of transacting business in the house, but he did not attempt to get up from his chair during his last visit.

Mrs. Cadle testified that she knew Mr. Huffman about six years prior to his death but had not seen him for sometime prior thereto, as she had been living elsewhere and did not move back to that neighborhood until the first of February, 1903, which was a year before Mr. Huffman died. That she saw Mr. Huffman on New Year's day before his death. That at that time he was crippled up with rheumatism but his mind seemed to her to be all right. Q. About his conversation, state about his conversation? A. Well he talked to me like he always did. Ask him "how do

you feel," he would say "well, feeling bad" or "feeling pretty bad." That she also saw him Thursday, Friday, Saturday and Sunday prior to his death. At those times his mind seemed to be all right, never noticed anything to indicate his mind was wrong but had no conversation with him, only to say good-morning when I would go in and he would shake hands with me and call me "Mrs. Cadle." I asked him how he was feeling, he would say "He was feeling pretty bad," and on Sunday evening before she left she went in and shook hands with him and said good-bye, and he said, "Good-bye, Mrs. Cadle, come back soon." On cross-examination she testified that on Thursday, Friday, Saturday and Sunday she had no conversation with him except to say how do you do and asked him how he was feeling. He would say "pretty badly." Did not know whether he was blind or not. He would sit in his chair, leaning over with his head in his hands. All of them seemed to be waiting on him.

W. B. Schraeder testified that he knew Mr. Huffman before his death. That he was there the Saturday night before he died. "Q. Tell the court there what his mental condition was at that time. A. Well, he was, seemed pretty feeble, sat up in a chair, did not have much to say, only when Will Huffman would speak to him, ask him what he wanted, he would tell him what he wanted, or if he did not want anything he would say 'no.' He was sitting up in a chair when I saw him." On cross-examination he testified that when Will Huffman would ask him questions he would "just say yes or no."

T. T. Rodes testified that he went to the home of Jacob Huffman, and, after warming, he said to Jacob Huffman that it was late and they had better transact the business for which he was sent for, and then asked him what land it was he wanted to deed to William, and that in reply he said the unincumbered land. That in response to his question Mr. Huffman

told him to state the consideration in the deed at $40, just what the land cost him, and that he did not want to pay the taxes which were then assessed against it. That when Mr. Rodes asked Mrs. Huffman if she was willing to sign the deed she said, "No,"'it was all new to her, and that after making several excuses for not signing it, said Eddie's rights had not been properly cared for, whereupon Mr. Huffman said that Eddie had forfeited all claims on him by reason of his going to California. That after that remark by Mr. Huffman, he, Rodes, again asked her if she was willing to sign the deed, to which she replied, "Mr. Rodes, it ain't legal, my husband ain't able to make a deed." To that he (Rodes) replied, "Mrs. Huffman, that is no fight of yours, your husband is competent and knows what he is about, and if you have any doubt in regard to it I will hold a conversation with him in your presence." I then moved my chair over there to where Mr. Huffman was sitting, I says to Mr. Huffman, "Do you know who I am?" He says, "Yes, Friend Rodes." "Do you know what I came out here for?" He says, "Yes." "What was it?" "To make a deed to William." I says, "Do you want that deed made?" "I do." I said to Mr. Huffman, "Do you remember a conversation you had with me in my office in the fall of 1900 in which you told me that Wm. T. Huffman owned a half interest in this prairie farm?" He said, "I do." I said, "Do you recall that you stated that you expected to make him a deed to said land?" He said, "I do." I says, "Is it your wish that the deed now be made?" He says, "It is." I then turned to Mrs. Huffman. I said, "Mrs. Huffman, Mr. Huffman is entirely rational and competent, knows what he is doing, are you willing to sign this deed?" She says, "Yes." I asked him if he was able to sign his name, he said he was not. I wrote his name and went to where he was and had him to touch the end of the pen to make a cross. I asked him if that

was his free act and deed for the uses and purposes therein mentioned. He said it was. I then again returned to Mrs. Huffman and asked if she was willing to sign the deed. She said she was. I then took the acknowledgment, etc. Mr. Rodes also testified that he had known Mr. Huffman by sight for three or four years, and had met him in business matters two or three times prior to his death.

The foregoing is a recapitulation of all of the evidence disclosed by this record, and hereinbefore set out in full, bearing upon the mental capacity of Jacob Huffman to make the deed in question.

It should be borne in mind that none of the witnesses who testified for defendant regarding the mental condition of Jacob Huffman were experts, and that they only gave their opinions as to his mental condition. They did not base their opinions upon their observations of his conduct and expressions, for the reason that they neither saw him do an act nor heard him express any idea upon which they could base an opinion after he was taken with his last illness. During that fifteen or sixteen days of his earthly existence his life was as barren of acts and deeds as the desert of Sahara is barren of vegetation. He sat propped up in his chair wrapped up with blankets, with his feet resting upon a chair or cushion and his head resting in his drawn hands, scarcely able to breathe, never speaking except when spoken to and only then in monosyllables, giving expression of his terrible pain and suffering, or to make known the internal cravings of an empty stomach.

The law is well settled in this State that while non-expert witness may testify regarding the mental condition of a person, yet he must first testify as to the facts existing in his own knowledge which form the basis of his opinions. Such opinions must be based upon the conduct and expressions of the person whose mind is the subject of inquiry. [Sharp v. Railroad,

114 Mo. 94; State v. Williamson, 106 Mo. 162; State v. Erb, 74 Mo. l. c. 204, 205.]

This court, in discussing this question in the case first cited through BLACK, P. J., said, on pages 100 and 101: "A non-professional witness may give his opinion as to the mental condition of another in connection with a recital of the facts upon which he bases his conclusion. This is the well-settled law of this State. [Crowe v. Peters, 63 Mo. 429; Moore v. Moore, 67 Mo. 192; Appleby v. Brock, 76 Mo. 314.] But the value of such opinion depends wholly upon the opportunity the witness had to observe the conduct of the person whose mind is in question and upon the incidents actually observed. These circumstances should be stated, first, to make the opinion competent as evidence; and, second, to enable the jury to estimate the value of the opinion. Indeed, a non-professional witness may relate the facts without expressing any opinion at all, leaving it to the jury to draw the conclusion with or without the aid of experts."

From these authorities it is seen that the facts upon which the non-expert's opinion is based is the principal element of such testimony, and that the opinion of the witness is only a secondary matter, and when such facts do not warrant such opinion, then the opinion should be excluded. [State v. Erb, supra.]

If we view the evidence in this case under the rules above enunciated, it is apparent that none of the witnesses who gave their opinion regarding the mental condition of Jacob Huffman were qualified to give such an opinion, for the reason that they did not possess sufficient knowledge of his conduct and expressions upon which to base an intelligent opinion touching his mental condition, and for that reason their opinions in that regard should have been excluded, had timely objection been made to their admissions; but notwithstanding the admission of such opinions without objection, they were nevertheless absolutely without

weight or probative force, and should not be considered in summing up the weight of the evidence. If we, therefore, strike out the opinions given by the non-expert witnesses as worthless and let stand all their testimony regarding what they said they saw Jacob Huffman do and heard him say during that last two weeks of his life, would any one for a moment contend that said acts and words would be evidence of his mental capacity to make a deed? I think not, for the reason that such acts and expressions we observe in dumb brutes and insane persons and are not necessarily indicative of mentality. In this connection it might be suggested that Jacob Schraeder's opinion was based upon a conversation regarding business matters had with Mr. Huffman on February 21st, eight days before he died. That is true, but what was the character of that conversation? It was to the effect that he heard Mr. Huffman say that the rats had eaten up enough of Will Huffman's corn to feed a hundred head of cattle. That is a most remarkable story for a sane man to tell. If he said that to Mr. Schraeder, then if it points to anything it is toward insanity or unbalanced mind, for the reason that it is common knowledge that an ordinary steer on feed will eat one-half bushel of corn per day, and at that rate one hundred head would eat fifty bushels per day, and if fed only during the minimum period cattle are fed, which is one hundred and twenty days, the amount they would consume would be six thousand bushels. I must confess that that is quite a large quantity of corn for rats to destroy on one little farm. The effect of that evidence cannot be destroyed by saying that Mr. Huffman was speaking facetiously or in a spirit of jocularity, for the reason the testimony of every witness who testified regarding his physical condition at that time showed he was suffering inexpressible pain from his physical ailments, which were more serious and deadly than were those of Job:

His physical pain and mental anguish were such that it would be wholly unreasonable to believe he meant to be facetious or jocular at the time testified to by Mr. Schraeder; and as we have no evidence upon which to question the credibility of Mr. Schraeder's testimony, we must hold that if said testimony has any weight whatever, standing alone as it does, it would indicate a morbid or deranged mind.

But there is another view to be taken of the evidence in this case, and that is, all of the physical facts of the case and all of the undisputed testimony are corroborative of the testimony of Mrs. Huffman and Dr. McMurry, which is to the effect that Jacob Huffman did not possess sufficient mental capacity to understand the nature of the business he was transacting when he authorized his name to be signed to the deed. We all know from personal experience and ordinary observation that sickness, physical pain and suffering affects the mind, and the more serious the sickness and the more severe the pain and suffering, the greater is the effect upon the mind; and if that rule is applied to Mr. Huffman at the time the deed was made, then he must have been a physical, nervous and a mental wreck. And his conduct and expressions would indicate as much. All he did was to sit propped up in a chair, with head bowed in his hands, and every now and then give expressions of the pain and anguish he was suffering and occasionally call for some milk to drink. It is a noteworthy fact that no witness who testified for plaintiffs or defendant regarding Mr. Huffman's condition during his last sickness ever saw him for one moment, day or night, when he was not sitting propped up in his chair, wrapped in blankets, with his elbows resting upon his knees and head bowed in his hands, or heard a word escape his lips which was not expressive of physical pain and mental anguish, excepting what Mr. Schraeder testified to regarding the conversation he had with him regard-

ing the rats, and what Mr. Rodes testified to regarding the answers given by him during the examination he put him through touching his capacity to make the deed; or pass the salutations of the days when spoken to. Did any sane man on earth ever act in that manner, or could a sane man so act? I think not.

The evidence in the case should also be weighed according to the following well-settled rule, and that is, those witnesses who bear close family, social or business relations to the person whose mind is under investigation, as well as the family physician, possess the most favorable opportunities for knowing his mental condition, and usually their testimony as to his mental capacity is entitled to greater weight. [Holton v. Cochran, 208 Mo. 314, l. c. 417 and 418.

According to this rule what witnesses would be most likely to observe and know the changes, if any, in Mr. Huffman's conduct and expressions, his loving and dutiful wife, who was ever at his side and diligently watched every move and attentively listened for every word spoken and tenderly administered to his every want, and his family physician who diagnosed his case and treated him for his many ailments; or two or three neighbors who called a few times to see Mr. Huffman in his last sickness? The answer must be in favor of the wife and family physician, according to all known rules of weighing evidence, and such is the common sense of the situation.

They had no opportunity to observe and know of the changes that his wife and the doctor testified to, and, consequently, the idea that his mind was unbalanced never entered their minds. They simply saw his physical changes and distress without having their attention called to his mental changes.

But independent of the observations before made, this case possesses a few inherent infirmities which are worthy of note. First. The evidence of defendant tended to prove that the day before Jacob Huff-

man made the deed he sent for Mr. Rodes to come out and draw the deed. We do not doubt but what he was sent for by some one, but the strange part of the story is that Mr. Huffman, suffering as he was at the time and being in the constant care and under the close observation of Mrs. Huffman, should send for Mr. Rodes to come and transact such an important matter of business without so much as mentioning the matter to her, which could not have been properly performed without her assent and signature. How did he know she would sign the deed? No one had ever before consulted her or obtained her views regarding the matter. And, again, it is passingly strange that such a message could have been sent to Mr. Rodes without Mrs. Huffman knowing something about it without it was intentionally withheld from her, since she was his constant attendant during all his last sickness. If intentionally withheld from her, then that would indicate a fraud had been perpetrated upon her rights.

The evidence also shows that after Mr. Rodes reached the room where Mr. Huffman was sitting and began talking with Mrs. Huffman about the deed, the defendant continued to absent himself from the room, and after being sent for twice he was admonished to stay there until the matter was disposed of. That conduct was not in keeping with the ordinary affairs of life, nor indicative of upright and honest dealing. The old proverb, "The wicked flee when no man pursueth," seems to perfectly fit his case. If his father had sent him for Mr. Rodes to come and make the deed, why should he absent himself from the room where he was needed to give the information regarding the boundaries of the land to be conveyed, and where his interests demanded his presence? But, no, like to Arab of old, he quietly folded his tent and silently stole away, and left his mother in her dis-

tressed and helpless condition to wage an unequal legal contest with his shrewd and able lawyer.

Again, it is conceded on both sides that Mrs. Huffman not only objected to signing the deed herself, but she also earnestly objected to her husband doing so, and, among other reasons, she insisted at all times that he was not mentally capable of doing so. Under those conceded facts it is remarkably strange that an old and experienced lawyer would tell her that was not her fight, when she was fighting to preserve her own valuable rights and those of her helpless husband. And still more strange, if true, that Mr. Rodes should then and there through his own volition undertake to put Mr. Huffman through a mental examination to test his capacity to make the deed. Mrs. Huffman testified that nothing of the kind took place, and all the facts and circumstances in this case corroborate her in that statement and contradict the improbable story of Mr. Rodes.

But it is argued that the evidence shows that the defendant was really the owner of about one-half of the equitable interest in the "prairie farm," and that the deed was made by Jacob Huffman for the purpose of conveying to defendant that which in equity belonged to him. If that was true, then defendant would have been entitled to have the deed under which his father held the entire title reformed so as to show the fact that he owned the one-half thereof; and before this deed can be sustained upon that theory the evidence should have been clear, strong and convincing, leaving no doubt in the mind of the chancellor as to the justice and equity of his claim. But, unfortunately for defendant, there is no such evidence contained in this record. The only evidence bearing upon that question consists of two or three loose and disconnected declarations alleged to have been made by Jacob Huffman to some two or three different persons covering a period of three or four years. That evi-

dence is not sufficient to warrant any court in upholding this deed upon the ground that defendant was the real owner of one-half of the equitable interest in said farm, and that this deed only conveyed to him that which he was in equity and justice entitled to. This court has many times held that loose declarations of deceased persons regarding property standing in his name, as being that of some one else, will not be sufficient to establish title in such person; and that all testimony of verbal admissions and statements of persons since dead is entitled to but small weight in establishing such a right. [Woodford v. Stephens, 51 Mo. 443; Ringo v. Richardson, 53 Mo. 385; Modrell v. Riddle, 82 Mo. 1. c. 36.]

Let us take a bird's-eye view of this case. In September, 1903, we find the defendant, Wm. T. Huffman, a strong vigorous young man, going over to the home of his aged father, who was sick and infirm, unable to attend to his farm and ordinary business affairs, and, in consequence thereof, he moved his father and mother to his own home and there kept him until his death, which occurred on the 29th day of February, 1904. During those few months the son had charge of his father's business, looked after and rented his farm, and negotiated a loan for him, which was secured by mortgage on a portion of his farm.

The uncontradicted evidence showed that the land conveyed to the son was worth $5,000 or $6,000, and was worth from $1,000 to $1,800 more than the interest the son claimed he owned in the farm. The physical condition of the father was such that he could not lie down but had for weeks sat propped up in a chair, wrapped in quilts and blankets; he was blind and deaf; he could not feed himself or otherwise administer to his own wants and necessities, but those kindly offices were performed by his wife, the same as if he had been a baby; his hands and feet were drawn and twisted out of shape by the ravages of rheumatism; his joints

were enlarged and swollen; he was unable to hold anything in his hands, not even a spoon with which to feed himself, or a pen with which to sign the deed in question; there was no circulation of the blood in the lower two-thirds of his lower limbs, and they were cold and blue, one of them having an offensive running sore on it. Asthma had all but shut off his breath, and his kidney troubles had filled his system full of poisonous matters, which caused his blood vessels to thicken, retard his circulation, and thereby prevented proper nourishment of his body. In that condition he sat in his chair for two weeks before his death and for ten days before the deed was executed, complaining all the time of his suffering and misery. These facts are not disputed by any one, but are substantiated by the testimony of every witness who testified in the case regarding his physical condition, those for defendant as well as those for plaintiff.

In my judgment those facts do not point very strongly toward a mind sufficiently sound to execute a deed, especially when it involved the settlement of accounts between the grantor and the grantee, as was necessary in this case. When we briefly consider his mental condition from what he said and did during those same two weeks, it presents the same weak and shattered condition in which we found his body.

According to all of the testimony, independent of that of Mr. Rodes, he uttered not a word except in saying "yes" or "no" in response to questions, or that he was feeling "mighty badly" or "very badly," or would occasionally say "good morning" or "good evening" when spoken to; also excepting upon one occasion, according to the testimony of one witness, Jacob Huffman invited her to call again; and according to that of another he said the rats upon the farm had destroyed sufficient corn to feed a hundred head of cattle. Not another word, that I can now recall, fell from his tongue during the last two weeks of his

earthly existence. And if one should gather together every word uttered by him upon all subjects during that time, I dare say that they would not cover the space occupied by six lines of the manuscript I am now writing. And should you add to those lines every word which Mr. Rodes testified that Jacob Huffman said while he was there, then I also venture the assertion that all told they would not fill the space occupied by ten printed lines in one of the Missouri Reports.

I have abridged this evidence to a very small compass in order that the mind may grasp it at a glance, and comprehend without difficulty the abject mental and physical condition of Jacob Huffman at the time it is said he touched the pen which signed his name to the deed in question.

Under those facts and conditions the deed was presented to Rebecca Huffman for her signature. For weeks she had been the constant attendant of her sick and diseased husband, caring for and administering unto his comfort and necessities, both day and night; burdened with his care and grieving over his sickness, suffering and rapidly approaching death, she at the time opposed and battled single-handed and alone with respondent, her son, and his able and experienced lawyer, against the execution of the deed, insisting that she knew nothing of the proposed transaction and that her poor, sick husband was mentally unsound and incapable of making the deed. But alas! when the battle had waxed warm, and she looked over and saw her poor sick husband, she gave up the fight, withdrew all objections and signed the deed rather than to have a fuss and scene before her frail, suffering husband.

These are the undisputed facts of the case, except as testified to by Mr. Rodes regarding Jacob Huffman's mentality. And in the light of those facts, I ask, is the deed which was executed by Jacob Huff-

man and Rebecca Huffman to Wm. T. Huffman, dated February 29, 1904, a valid and binding instrument?

My learned associates upon the bench, for whose ability and judgment I entertain the highest regard, answer in the affirmative, and base their opinion upon the testimony, as I gather it, of the non-expert witnesses who testified in the case, who neither had sufficient opportunity to observe and judge of his sanity, and whose testimony was not sufficient upon which to base an opinion in that regard.

The law of this State is well settled, as before shown, that non-expert witnesses are incompetent to give opinions as to the sanity of a person except where they first testify to the facts upon which they base their opinions, in order that the court or jury may determine from those facts what weight, if any, should be given to their opinions.

In my judgment none of those witnesses testified to a state of facts which of themselves indicated a sound mind, or were sufficient upon which to base an opinion that Jacob Huffman was capable of executing the deed in question.

Jacob Huffman would only speak to his physician when spoken to and then he would only say he was feeling "very bad, Doctor," or "mighty bad." Upon those answers Dr. McMurry testified that he was unable to state the degree of his mental strength, that he answered intelligently the two or three questions asked him, but that he did not think he possessed sufficient mental strength to transact general business.

Such answers are made by children and imbeciles every day, and would no more indicate a capacity to make a deed in the one case than in the other; and Dr. McMurry so testified, and could not, in my judgment, have honestly testified to anything else, for the reason that he did not see him do anything or hear him say anything which was sufficient upon which to base an opinion touching his mental capacity. If his

family physician was unable to base an opinion upon that meager evidence, how much more so would be the inability of the non-expert witnesses to do so? The mere asking the question answers it in the negative.

While the burden of proof rested upon appellants to show the incapacity of Jacob Huffman to make the deed, and that Rebecca Huffman, his wife, was induced to execute it through fraud and undue influence, yet, in my judgment, they proved both of those facts by the overwhelming weight of the evidence; and in my judgment the opinion of my associates stands without a parallel to support it in equity jurisprudence.

So, if we look at this case from any view point, we are unable to see any merit in defendant's case.

The learned trial court took the opposite view of the case and held the deed valid. While this court in equity cases where the witnesses have testified orally will defer somewhat to the findings of the chancellor, yet it will not be concluded by such findings where it is convinced that those findings are not supported by the weight of the evidence, but will proceed to make its own findings, and reverse and remand the cause, or enter here such judgment as justice and equity of the case may demand. [Benne v. Schnecko, 100 Mo. 250; Gibbs v. Haughowout, 207 Mo. 384.]

Entertaining the views I do regarding the law and facts of the case, in my opinion the findings should be for the plaintiffs, and a decree entered here setting aside and cancelling the deed in question.

I must, therefore, dissent from the conclusions reached by the majority opinion.